Norina D. PAUL, Appellant
(Plaintiff below),

v.

Theodore R. PAUL, Appellee
(Defendant below).

Theodore R. PAUL, Appellant
(Defendant below),

v.

Norina D. PAUL, Appellee (Plaintiff
below).

Nos. 5184, 5185.

Supreme Court of Wyoming.

July 29, 1980.

Kenneth S. Cohen, Jackson, for Norina D. Paul.

R. I. Leedy, of Hettinger & Leedy, Riverton, for Theodore R. Paul.

Before RAPER, C. J., and McCLINTOCK, THOMAS, ROSE and ROONEY, JJ.

ROSE, Justice.

These two cases involve a former wife's appeal from a property settlement in a divorce and the former husband's cross-appeal.

Mrs. Paul presents five issues in her appeal:

1. The trial judge erred in estimating the net worth of the marital estate and the husband's earning capacity, and this factual error prejudiced the property division;

2. The trial court abused its discretion in determining the property division;

3. The wife was prejudiced by the failure of the trial court to enforce her discovery rights;

4. The husband was at fault and the wife was prejudiced by the refusal of the trial court to allow evidence of the husband's fault; and

5. The judgment that the wife be responsible for a credit-card debt was improper on procedural grounds.

In his cross-appeal, Mr. Paul raises three issues:

1. The award of $10,000.00 to the wife for attorneys' fees is improper because the fees were not proved;

2. The trial court lacked jurisdiction to award some household furnishings which were owned by a corporation; and

3. The trial court acted arbitrarily in deeming that the husband or the corporation, of which he was a major shareholder, had waived right to the aforementioned furnishings.

We will affirm.

## FACTORS CONSIDERED BY THE COURT

The record shows that the court took the following factors into consideration in settling the property issue in this case:

Age of the parties; the number and age of the children of both parties by prior marriages and the child born as the issue of this marriage; the responsibility of each of the parties to all children; and the welfare of all of them. The age and station in life of each party was considered. The court took note of the probability of marriage of each of the parties. The court considered the length of the marriage and the separation, noting the parties had been separated for three years and divorce proceedings had been pending for some five years. The trial judge observed that the marriage had been stormy from the beginning. He considered the assets and liabilities brought into the marriage by both parties and the assets and liabilities of each party as they leave the marriage—the husband's ability to pay and earn—the wife's ability to earn—the financial requirements of both parties—and the social status of each. The court also considered the health of each of the parties—other pending divorce actions and the attorney-fee obligation of the parties. Generally speaking, the court took careful and con-

sidered note of all of the elements required by law in matters of this nature.

## THE FACTS

The wife was 28 and the husband 46 when they married—the second marriage for her and the third for him. They were 44 and 61 respectively when divorced, but they had been separated for three years prior to the divorce—in fact, a divorce petition had been filed in the East for some *five* years before the divorce and was pending when the court heard this case.

After trial, the court found the husband to have a net worth of $1,400,000.00 and an earning capacity of $75,000.00 per year. The judge's decision letter indicates that the husband also receives $24,000.00 a year from some of his income-producing property. In settling the property, the court took into account the probable retirement age of the defendant as being 65 with respect to his future expected earning capacity, as well as the wife's age, needs, and the probability that she will remarry.

According to the judge's decision letter, the wife brought $21,400.00 into the marriage, while the husband, at the time of the marriage, was worth $2,600,000.00, which figure included the husband's family home which he contributed to the marriage. These figures show, therefore, that during the fifteen or sixteen years from marriage to divorce, the net worth of the husband was depleted by some $1,200,000.00.

In addition to settling the property dispute and the divorce issues, the judgment provided for custody of the parties' only child in the wife and for child support of $300.00 a month until the child reaches majority or becomes otherwise emancipated. The husband is also ordered to pay for the college expenses at a college of the child's choice. The corpus of a trust capable of producing $20,000.00 per year to the wife for 34.2 years was also set over to the child of the parties when its obligation to Mrs. Paul had been discharged.

## Allegation of Trial Court's Factual Error

The wife alleges that the trial court erred in estimating the husband's net worth and annual earning capacity and that this error prejudiced the property division. The wife lists a number of assets owned by the husband, together with the respective value of each item. According to Mrs. Paul's arithmetic, Mr. Paul is worth more than $2,000,000.00 instead of the $1,400,000.00 found by the court or the $1,040,000.00 claimed by the husband. However, applying our appellate rules for resolving conflicts in the evidence, we do not find the wife's claim of factual error by the trial court meritorious. There is sufficient evidence of record to support the trial court's conclusion in this regard.

## PROPERTY DIVISION

*For wife—Household furnishings and items of personal property:*

The judgment contemplates that the wife is to have as her sole and separate property, items from their Pittsburgh residence, most of which are fine household furnishings, silver, jewelry, china and other articles of value. The list of these objects, single-spaced, consumes three legal-size pages of paper. The court did not set a value upon these various household furnishings and other items of personalty, but we observe and take judicial notice of the fact that the articles listed are of good quality and high value.

*Jewelry:*

There is evidence in the case that Mrs. Paul's Indian jewelry has a value of eighty to ninety thousand dollars. She retains this property, and she also retains a five-carat engagement ring.

*Cars, horses and snowmobiles:*

Mrs. Paul retains a truck, an expensive automobile, three snowmobiles and some horses. There is no monetary value set for these items.

*For husband:*

(a) *Family home:* The family home, valued at between $280,000.00 and $415,000.00,

was set over to the husband. The trial court apparently averaged these two figures and, after making allowance for taxes and assessments due, valued the home at $336,000.00.

(b) *Stocks and bonds*: The principal assets set over to the husband were stocks in various corporations. These assets, by and large, make up the difference between the family-home value and the net-worth figure previously indicated, i. e., $1,400,000.00.

## DEBTS AND OBLIGATIONS ORDERED BY THE COURT

A. *Wife's debts and obligations established by the decree*:

Mrs. Paul was ordered to discharge a credit-card obligation in the sum of $2,300.00, which was incurred by reason of her stealing and using the defendant's credit card. She was also left to pay some of her attorneys' fees incurred in this and other divorce suits filed in other states. How much of Mrs. Paul's attorneys' fees in other states the plaintiff or defendant will have to pay is not shown by the record. The court could not, of course, have ascertained this.

B. *Husband's debts and financial obligations established by the decree*:

(1) The defendant husband was ordered to finance a trust fund in a way which would return to Mrs. Paul $20,000.00 per year, commencing one year from the judgment and continuing for 34.2 years or life, whichever was the shorter period of time, with the corpus to go to the child of the parties when the fund's obligations to Mrs. Paul had been discharged. This award returns to Mrs. Paul $1,666.66 per month throughout her life expectancy. It imposes upon the husband a total obligation of approximately $680,000.00 from trust fund payments (assuming a figure of $200,000.00 is sufficient to fund the trust) and is somewhat more than one-half the amount that Mrs. Paul testified would be sufficient for her needs.

(2) Mr. Paul was further ordered to pay to the plaintiff the sum of $2,000.00 per month for one year, or $24,000.00.

(3) The defendant was ordered to pay $10,000.00 for the plaintiff's Wyoming attorney's fees.

(4) Mr. Paul was ordered to pay $300.00 per month for the support of the minor child until majority or emancipation. Assuming she goes to college at age 18 (when approximately $5,000.00 per year becomes the obligation of the husband), the husband must pay $3,600.00 per year for three years, or $10,800.00.

(5) The husband was ordered to pay for the daughter's college education; even though there is no evidence as to the cost of this obligation to the defendant, we assume it to be a minimum of $20,000.00.

The total financial obligation of the husband to the wife and child is:

1. $680,000.00 to the wife over a period of 34.2 years;

2. $24,000.00 to the wife over a period of one year;

3. $10,000.00 for the wife's Wyoming attorney's fees.

4. $10,800.00 for child support before college; and

5. $20,000.00 for college education for child of the parties,

making a total of $744,800.00 ($750,000.00, rounded).[1]

1. Redundant, but still real, is the defendant's obligation to furnish the trust with a sum of mony which will do two things:
 (a) Furnish the plaintiff $20,000.00 a year.
 (b) Be intact at the end of 34.2 years and available for the child of the parties at that time.

The dreamers might say that in this day and age of high interest rates, this will take only $200,000.00. Most of the members of this court remember when it would have taken $400,000.00—and it might again!!

The final box score looks like this:

| | |
|---|---|
| The husband is obligated to pay . . | $750,000.00 |
| The wife receives in payments . . . | $714,000.00 |
| The child receives in payments . . | $230,800.00 [2] |
| The wife receives (in jewelry value) . . . . . . . . . . . . . . . . . . . . . . | $ 80,000.00 |
| The wife receives (in household furnishings, truck, automobiles and horses an undetermined amount) . . . . . . . . . . . . . . . . . . | $_____ |
| Total paid by husband . . . . . . . . | $750,000.00 |
| Total received by wife . . . . . . . . . | $795,000.00 |
| (*plus* the value of household items, automobiles, truck, horses and personal property). | |
| Total received by child . . . . . . . . | $230,800.00 [3] |

## LEGAL QUESTIONS RESOLVED

I. *Was the property division just and equitable*?

In evaluating the wife's claim that the property division was not just and equitable and was an abuse of the trial court's discretion, we must look to both our statutory and case law.

Section 20–2–114, W.S.1977, provides:

"In granting a divorce, the court shall make such disposition of the property of the parties as appears just and equitable, having regard for the respective merits of the parties and the condition in which they will be left by the divorce, the party through whom the property was acquired, and the burdens imposed upon the property for the benefit of either party and children. The court may decree to the wife reasonable alimony out of the estate of the other having regard for his ability and may order so much of his real estate or the rents and profits thereof as is necessary be assigned and set out to either party for life, or may decree a specific sum be paid by him."

An analysis of the statute and the Wyoming cases interpreting it or similar predecessor statutes, finds the following principles relevant to the case at Bar:

1. The trial court has great discretion in dividing the property. "[A] just and equitable division is as likely as not to be unequal." *Piper v. Piper*, Wyo., 487 P.2d 1062, 1064 (1971). There are "no hard and fast rules" governing property divisions. *Young v. Young*, Wyo., 472 P.2d 784, 785 (1970).

2. The trial court's discretion won't be disturbed except on clear grounds, e. g., *Piper*, supra, at 1063.

3. The Wyoming Supreme Court cannot constitute itself as a court of the first instance to divide property in divorce cases. *Merritt v. Merritt*, Wyo., 586 P.2d 550, 555 (1978).

4. "Generally speaking, a settlement [property settlement] needs to be judged on an overall basis and not necessarily on the basis of separate parts." *Piper*, supra, at 1065.

5. The length of marriage is a consideration. *Id.*

6. Judicial discretion should not be exercised so as to reward one party and punish the other. *Storm v. Storm*, Wyo., 470 P.2d 367, 371 (1970); and *Beckle v. Beckle*, Wyo., 452 P.2d 205, 208 (1969). But the court should consider the parties' merits. *Id.*

7. Joint ownership of property resulting from a demonstrated intent to share is a "burden imposed upon the property for the benefit" of both owners; the statute directs consideration of this burden as one factor. *Id.*

8. The court should consider through which party the property was acquired. *Id.*

9. The court should consider the condition in which the parties will be left after the division. *Id.*

**2.** This figure is based upon the optimistic assumption that the trust can be funded from $200,000.00. See, fn. 1, supra.

**3.** The amount received by the wife and child is greater than the amount the court ordered the husband to pay because the district judge wisely caused the trust to be established so that a minimum sum of money could be invested to serve two purposes—income for the wife and a sum certain for the child when the purpose of the trust had, in the wife's behalf, been served.

10. An award of property is a preferable, modern substitute for alimony. *Young v. Young*, supra, at 786–787.

11. A property division may reach the separate property of either spouse. E. g., *Craver v. Craver*, Wyo., 601 P.2d 999 (1979).

12. The question of who pays the attorney fees is a part of the property division. *Karns v. Karns*, Wyo., 511 P.2d 955, 956 (1973).

In reviewing our case law which contemplates contested property divisions, *Warren v. Warren*, Wyo., 361 P.2d 525 (1961), may be utilized as a backdrop against which the property distribution in these appeals is considered.

In *Warren*, supra, 361 P.2d at 526–527, we said:

". . . [O]n several previous occasions this court has announced these principles with respect to property divisions in divorce cases: (1) In making a division of property under the statute the trial court exercises a discretion; (2) there are no hard and fast rules to control its action; (3) the statute does not require an equal division; (4) a just and equitable division is as likely as not to be unequal; and (5) the decision of the trial court should not be disturbed, except on clear grounds, as that court is usually in a better position than the appellate court to judge of the respective merits and needs of the parties. See *Boschetto v. Boschetto*, 80 Wyo. 374, 343 P.2d 503, 506; *Crawford v. Crawford*, 63 Wyo. 1, 176 P.2d 792; *Garman v. Garman*, 59 Wyo. 1, 136 P.2d 517, 518; *O'Day v. O'Day*, 47 Wyo. 22, 30 P.2d 488, 489; *Lovejoy v. Lovejoy*, 36 Wyo. 379, 256 P. 76, 79; Id., 38 Wyo. 358, 267 P. 91.

"In the case of *Boschetto v. Boschetto*, supra [80 Wyo. 374, 343 P.2d 506], it was said:

" 'Inasmuch as a trial court's judgment cannot be disturbed except on clear grounds, we have seldom interfered with the action of the trial courts and whenever we have done so we have interfered only to a very limited extent. It is readily seen that unless we adhere to that course we should be apt to have before this court a plethora of appeals in divorce cases involving a division of property and asking us to virtually constitute ourselves as a court of first instance to divide the property. We do not think that this is the function of this court.' "

The Warren marriage lasted twenty years—longer than the Paul marriage. The Warren marriage also produced issue—three children by Caesarean section; additionally there were three interrupted pregnancies. The Warrens' marital estate appears to have been worth slightly over $800,000.00, an amount comparable to the value of the Pauls' marital estate if we take the inflation factor since 1961 into account. In *Warren*, as in the Paul marriage, virtually all of the assets of the marital estate were acquired by the husband. (The *Warren* husband inherited most of these assets during the marriage; in the case at bar, the husband brought his assets into the marriage.) The *Warren* trial court made approximately a 15 to 1 division in favor of the husband, awarding the wife some $55,000.00 and the husband some $750,000.00. The trial court also provided for monthly payments to the wife of $500.00. Upon the wife's appeal, we affirmed, although we modified a portion of the judgment so as to enable the wife to continue receiving the monthly payments even if she remarried. (We did so because we thought the trial judge intended a property division, not an award of alimony.) The $20,000.00 per year trust fund arrangement for Mrs. Paul compares favorably with the $6,000.00 per year award to the *Warren* wife.[4]

4. We note that Mr. Warren's obligation was to pay a sum certain each month, while retaining the use of his remaining funds for *his* own investment and income purposes. Mr. Paul, on the other hand, was ordered to deposit a sum in trust (which, under present interest rates we assume to be at least $200,000.00), thus forever depriving him of the income from the investment in favor of his wife and child. It can thus be seen that Mrs. Paul not only received more than three times as much as Mrs. Warren on a yearly basis, but Mr. Paul was deprived of his capital in order to fund his obligation to wife and child, while Mr. Warren was not.

In finding as we do that the trial judge did not abuse his discretion in allocating property for settlement purposes, we offer the following: As an appellate court, we consider that our power to disturb a property settlement fixed by a trial judge is limited indeed. There must be a clear abuse of discretion before we will upset or adjust such a settlement. We consider "abuse of discretion," to be such abuse as shocks the conscience of the court. It must appear so unfair and inequitable that reasonable persons could not abide it.

We will not—except in extreme circumstances—reach in and readjust property distributions which our able trial judges have described after presiding over the trial which furnishes them with great advantage for decision-making in such matters.

The question cannot be, What would we have done as trial judges? but must be and is, Did the trial judge act so outrageously in his property settlement decision as to constitute an abuse of discretion?

In this case, we are asked to say that such was the conduct of a judge who—in settling the issues of this difficult case—guaranteed 44-year-old Mrs. Paul about $800,000.00, most of which is spread over her life expectancy, and the child approximately $230,800.00, while at the same time leaving the 61-year-old husband with what seems, according to the considerations appropriate in these cases, to be a fair and equitable distribution of the family assets—almost all of which he brought into the marriage.

Not only do we not find that the judge abused his discretion, but we find the distribution fair, just and judiciously contrived.

*Discovery.*

Discovery in this case has been complicated by the fact that lawsuits for divorce were filed in three states. The wife originally filed in 1974 in Pennsylvania. A reconciliation was achieved in 1974, but the Pennsylvania lawsuit survived the reconciliation; in 1976 the couple separated, and the Pennsylvania suit for divorce was activated. In 1977, the wife initiated the present Wyoming action. In 1979, the husband initiated suit for divorce in Arkansas.

Mrs. Paul alleges prejudice due to the trial court's refusal to impose formal sanctions to enforce her discovery rights. In December of 1978, the wife served 30 interrogatories on the husband requesting, *inter alia*, detailed financial information. These were not answered and the wife petitioned the trial court for redress. The trial court then threatened the husband with an averse judgment if he did not respond. This resulted in the husband's making himself available to orally answer the questions on February 26, 1979. At that proceeding, Mr. Paul answered some questions directly. Other questions he insisted on answering by asserting that the question had already been answered during discovery or other proceedings attendant upon the Pennsylvania or Arkansas lawsuits and that he was being subjected to harassment. He declared that he was unable to answer some questions on the grounds that Mrs. Paul had stolen and destroyed many of his business records.

Several days before the acrimonious February 26 proceeding, the husband had filed in the trial court a notice that he would make available for inspection on February 26 various documents relevant to the interrogatories. These were not produced at the meeting.

Shortly before the trial, the husband was served a *subpoena duces tecum*. This was apparently not complied with.

Prior to trial, the plaintiff moved the court for sanctions, alleging that her husband had failed to satisfactorily answer the interrogatories at the February 26 meeting. The motion detailed the reasons why she had been unable to procure transcripts of the various Pennsylvania proceedings. At the opening of the trial, the trial judge stated that he was taking this motion under advisement. During the cross-examination

of the husband at trial, the wife's counsel established the husband's failure to comply with the *subpoena duces tecum,* but did not show prejudice flowing from the failure to complete discovery.

■ Rule 37, W.R.C.P., provides that the trial judge *may* impose sanctions for failure to comply with a discovery order. This means that the trial court has discretion to impose or not impose one of the listed sanctions. See, *National Hockey League v. Metropolitan Hockey Club, Inc.,* 427 U.S. 639, 96 S.Ct. 2778, 49 L.Ed.2d 747 (1976), rehearing denied, 429 U.S. 874, 97 S.Ct. 197, 50 L.Ed.2d 158 (1976), for a discussion of the trial court's discretion under Rule 37, F.R.C.P. See, also, *Marshall v. Ford Motor Co.,* 10 Cir., 446 F.2d 712, 713 (1971). *Satterfield v. Sunny Day Resources, Inc.,* Wyo., 581 P.2d 1386, 1388 (1978), rehearing denied, is also suggestive of this conclusion. Upon appellate review, the function of the reviewing court is not to put itself in the place of the trial court and to determine with hindsight what sanction, if any, would have been most appropriate; the reviewing court's task is simply one of deciding whether or not prejudice had been suffered by reason of the trial judge's alleged abuse of discretion. *National Hockey League,* supra. See, also, *Local Union No. 251 v. Town Line Sand & Gravel, Inc.,* 1 Cir., 511 F.2d 1198 (1975). In the case at Bar, the trial judge dealt with the counsel; he was in a position to assess the husband's claim of abusive discovery; and he was in a position to better estimate whether the husband's improper conduct was prejudicing the wife's efforts at trial. We cannot conclude, as a matter of law, that the trial judge abused his discretion by failing to impose sanctions.

*Testimony on fault.*

■ The transcript shows that the trial judge told the parties that he would not consider fault in a division involving this much property. The wife concedes that Wyoming is now a no-fault divorce jurisdiction but argues that the legislature intended to retain the issue of fault in property settlements because § 20–2–114, supra, still directs the court to have regard "for the respective merits of the parties." We are not persuaded. The trial judge has great discretion in dividing the property and he is not to use the property division to punish one of the parties. *Storm,* supra. When there are adequate assets to comfortably provide for both of the parties, the trial court does not abuse its discretion when it refuses to permit the parties to air their dirty laundry in court.

*The credit-card debt.*

The wife argues that the divorce court may not adjust her rights against those of a creditor during the divorce action. However, we consider this argument inapplicable to the facts of this case since there is no argument that the credit-card debt is not valid. A division of the marital estate of necessity involves an assignment of assets and liabilities.

■ We see no need to discuss whether or not the assignment of this liability to the wife instead of to the husband was fair. A property division must be judged on an overall basis. *Piper,* supra. It is unreasonable to suggest that our determination of whether the trial judge abused his discretion in dividing all of the property and liabilities of the Pauls could turn on the assignment of a $2,300.00 credit-card debt.

*Award of attorneys' fees to the wife.*

■ The husband protests the award of $10,000.00 to the wife for attorneys' fees on the grounds that there is no proof that the fees were reasonable. The record reflects that lawsuits for divorce were filed in Arkansas and Pennsylvania, as well as Wyoming. The fight over the division of property was complicated. We note that the husband informed the court that he had incurred $87,000.00 in attorneys' fees as a result of the divorce. The wife testified that she had incurred Wyoming attorneys' fees of more than $14,000.00. Mrs. Paul's Wyoming counsel told the court that the wife's total attorneys' fees were on the order of $75,000.00. In his decision letter,

the trial judge states that the Pennsylvania attorneys' fees were ridiculous. The court emphasized that it was not describing the Wyoming attorneys' fees as ridiculous. The judge computed the wife's Wyoming attorney's fees to be $13,000.00. Given the complexity of the case and the undisputed fact that very large attorneys' fees were incurred by both parties, we think the trial court had more than adequate ground for justifying an award of $10,000.00 to plaintiff's attorney for attorney fees.

*Corporate ownership of the furnishings.*

 The husband objects that the property division included an award to the wife of some furniture allegedly owned by a corporation of which the husband was chairman of the board and of which he owned 40 percent or more of the stock. The furniture was among that removed by the wife from the corporation lodge property near Dubois after she was forced from occupancy thereof by virtue of a writ of possession issued in another civil action. The trial court requested the husband to specify the property claimed. The court stated in its opinion letter:

> "The Court has never heard from the husband with respect to the property he alleged the wife took from the Dubois property.
>
> "In view of the husband's inaction with respect to these matters the Court takes the position that the wife may have the items listed on Exhibit A and the husband has abandoned his claim, if any he ever had, that the wife took any property from the Dubois property to which she was not entitled."

We find nothing in the record upon which to dispute this finding. We further note that the husband's legal argument on this point consisted of a quotation from the Wyoming Constitution. Such perfunctory argument could be considered insufficient to merit our attention. E. g., *Elder v. Jones*, Wyo., 608 P.2d 654, 660 (1980).

*Arbitrary action by the trial court.*

As mentioned earlier, the trial court awarded the wife a lengthy list of furnishings, as well as decreeing that the husband had abandoned any claim he might have to furnishings from the Dubois residence. The husband appeals and claims that the trial judge acted arbitrarily. The trial judge has great discretion in making a property division and we do not find it to have been abused in making this distribution.

The judgment of the trial court is affirmed.

McCLINTOCK, Justice, dissenting.

Because I do not believe that this court can say as a matter of law, that the trial judge did not abuse his discretion by failing to impose sanctions, and because I do not believe that the trial judge was justified in requiring that a trust fund be set up for Mrs. Paul in lieu of awarding her a lump-sum payment representing the property settlement, I must dissent.

*Pretrial Discovery*

To predicate appellate review upon the theory that "the reviewing court's task is simply one of deciding whether or not prejudice had been suffered by reason of the trial judge's alleged abuse of discretion," 616 P.2d at 715, is to ignore the purpose of the rules of discovery. The threshold question must be whether the trial judge abused his discretion in failing to impose sanctions. If this question is answered affirmatively then this court must make a determination as to whether this abuse of discretion was prejudicial.

In determining that the trial judge did not abuse his discretion in the case at bar, the majority has made the following findings:

> ". . . the trial judge dealt with the counsel; he was in a position to assess the husband's claim of abusive discovery; and he was in a position to better estimate whether the husband's improper conduct was prejudicing the wife's efforts at trial." 616 P.2d at 715.

These findings represent a half-hearted attempt to demonstrate that this court has

reviewed the acts of the trial court, when in actuality this court is merely rubber-stamping the trial judge's decision without making an independent determination as to whether or not there has been a proper exercise of discretion. The opinion handed down today neither supports the purposes for which the rules of discovery were enacted, nor does it give any direction to trial judges who will in the future face questions involving the imposition of sanctions for failure to comply with the rules of discovery.

Pretrial discovery provided for by Rules 26 to 37, W.R.C.P. is one of the most useful tools a litigant has. As Mr. Justice Jackson has aptly stated in a concurring opinion in *Hickman v. Taylor*, 329 U.S. 495, 515, 67 S.Ct. 385, 395, 91 L.Ed. 451 (1946), " '[d]iscovery' is one of the working tools of the legal profession." The rules of discovery have changed the atmosphere of a trial from that of a game where each side is attempting to surprise the other, to a fair contest where each party is required to present fairly all of the pertinent facts in support of his case. As stated in *United States v. Proctor & Gamble Co.*, 356 U.S. 677, 682, 78 S.Ct. 983, 986, 2 L.Ed.2d 1077 (1958), discovery "make[s] a trial less a game of blindman's bluff and more a fair contest with the basic issues and facts disclosed to the fullest practicable extent." And, as pointed out in *Greyhound Corporation v. Superior Court, Merced County*, 56 Cal.2d 355, 15 Cal.Rptr. 90, 99, 364 P.2d 266, 275 (1961), quoting Professor David W. Louisell, " '* * * a law suit should be an intensive search for the truth, not a game to be determined in outcome by considerations of tactics and surprise. * * *' "

The Wyoming rules of discovery are modeled after the federal rules of discovery and both were adopted in order to accomplish the following results: (1) to expedite both preparation for the trial and the trial itself by a simplifying and narrowing of the issues; (2) to provide the litigants a means to ascertain the truth and to aid in preventing perjury; (3) to aid in ascertaining the meritorious claims and defenses; (4) to inform the parties in advance of the trial of the value of their claims and defenses, thus encouraging settlement before trial; and (5) to minimize surprise at trial. *Greyhound*, supra, 15 Cal.Rptr. at 99, 364 P.2d at 275; *Hickman*, supra, 329 U.S. at 495, 67 S.Ct. at 385.

In order to accomplish these results the rules of discovery must be liberally construed in such a way as to favor disclosure of facts by both sides. While I do not question the majority's conclusion that the trial court has discretion in granting or denying discovery requests and in imposing sanctions for failure to comply with discovery requests, this argument cannot be used to defeat the purpose for which the discovery rules were enacted. *Greyhound*, supra, 56 Cal.2d 355, 15 Cal.Rptr. at 101, 364 P.2d at 277. As stated by the California Supreme Court,

"Undoubtedly the discovery statutes vest a wide discretion on the trial court in granting or denying discovery. The appellate courts in passing on orders granting or denying discovery should not use the trial court's discretion argument to defeat the liberal policies of the statute." 15 Cal.Rptr. at 101, 364 P.2d at 277.

The California discovery statutes, like our own discovery rules, are substantially adopted from the federal rules of discovery; however, they were not copies verbatim from the federal rules.

The California Supreme Court has set forth general rules that should be followed in determining whether a trial court has properly exercised its discretion and I find the following language most persuasive:

"In the 20 years since adoption of the act *Greyhound* has been considered by bench and bar as a prime authority in the interpretation of the act and the principles and policies on discovery matters. In considering the trial court's function we noted in relevant part: 'It is apparent, however, that each exercise of discretion will occur under a different set of facts, and that each case must, of necessity, be decided in light of those particular facts. But it is possible to lay down certain

general rules based upon the nature and purpose of the discovery acts which can be used in determining the proper exercise of discretion in all discovery cases. To constitute a proper exercise of discretion, the factual determination of the trial court should clearly and unequivocally be based upon the following legal concepts: [¶] 1. The legislative purposes [to give greater assistance to the parties *in ascertaining the truth* and checking and preventing perjury; provide an effective means of detecting and exposing false, fraudulent and sham claims and defenses; make available in a simple, convenient and inexpensive way, facts which otherwise could not be proved except with great difficulty; expedite litigation; simplify and narrow the issues; and expedite and facilitate both preparation and trial] are not to be subverted under the guise of the exercise of discretion; [¶] 2. *Those purposes are to be given effect rather than thwarted, to the end that discovery is encouraged*; . . .' (Pp. 382–383, 15 Cal.Rptr. p. 103, 364 P.2d p. 279, italics added.)" *Britt v. Superior Court of San Diego County*, 20 Cal.3d 844, 143 Cal.Rptr. 695, 710 [574 P.2d 766, 781] (1978) (Bird, C. J., Mosk and Newman, JJ., concurring opinion), quoting from *Greyhound*, supra.

In the case at bar the record indicates that the trial judge failed to give consideration to these factors when he denied Mrs. Paul's motion for sanctions. Mr. Paul deliberately and intentionally disregarded his wife's attempts to obtain discovery. In December of 1978 Mrs. Paul served her husband with 30 interrogatories requesting information concerning his financial status. After Mr. Paul failed to comply with the discovery request Mrs. Paul filed a motion to compel answers to the interrogatories. The trial court ordered that the husband answer the interrogatories by February 20, 1979, or judgment would be rendered for Mrs. Paul. Instead of complying with the court's order Mr. Paul's attorney contacted Mrs. Paul's attorney on February 15, 1979 and indicated that Mr. Paul would make himself available to answer the interrogatories orally and would at that time make available the documents requested in the interrogatories. Mrs. Paul's attorney reluctantly agreed to attend the session but stated in a letter to Mr. Paul's attorney that

"[o]f course, I still feel Mr. Paul should have answered the interrogatories in writing at some point during these past two months. If he had answered in writing with his records in front of him, I believe his answers would have been more accurate and complete than I expect his oral answers will be. In any event, even though I am not signing your stipulation, I will attend the session . . . ."

On February 21, 1979 Mr. Paul's attorney mailed a Notice of Availability of Documents and Intent to Produce Sworn Statements in Answer to Interrogatories to Mrs. Paul's attorney. The notice indicated that Mr. Paul would appear to orally answer the interrogatories and that he would at that time make available documents containing information requested in plaintiff's interrogatories. The session was held at Mr. Paul's attorney's office and when Mrs. Paul's counsel arrived for the oral questioning he was informed Mr. Paul's attorney had not arranged to have a court reporter present to record Mr. Paul's answers. After some discussion Mr. Paul's attorney contacted a court reporter and the questioning was transcribed. At the conclusion of the session Mr. Paul's attorney informed Mrs. Paul's attorney that Mr. Paul would not supply a transcript to either the court or to Mrs. Paul. Mrs. Paul was forced to pay for a transcript of the proceedings even though under the rules of discovery the written answers to the interrogatories should have been supplied to her at no expense.

Mr. Paul did appear to orally answer the interrogatories, but he did little more than make an appearance. Not only did he fail to bring the requested financial documents, but his response to many of the questions propounded by his wife's attorney were argumentative and incomplete. On a number of occasions he stated that the question had previously been answered in Arkansas or

Pennsylvania. Apparently Mr. Paul failed to produce any transcript of those proceedings. While the record is not clear on this point, I gather that Mrs. Paul had access to the transcript of the Arkansas deposition that was taken approximately a week before the oral questioning in Wyoming. It is interesting to note that Mr. Paul instituted the Arkansas divorce proceeding after the case at bar had been set for trial. It also appears that Mrs. Paul had access to a deposition taken in Pittsburgh, Pennsylvania, on August 31, 1978, but that she was unable to obtain a transcript of the Pennsylvania support hearing that was held in September of 1979. While I am aware of the fact that Mrs. Paul had access to a body of previous testimony, some of which undoubtedly concerned Mr. Paul's financial situation, much of the information that she needed to determine Mr. Paul's net worth has never been supplied. In Mrs. Paul's motion for sanctions she had set forth in detail the questions that Mr. Paul has never answered. (See Appendix.) The information was crucial to Mrs. Paul's case. The record indicates that Mr. Paul is a very successful businessman with a multitude of financial holdings both in this country and Mexico. Because of the mere number of financial holdings, Mrs. Paul cannot be expected to be able to present a correct financial picture of her husband's holdings without adequate discovery.

In addition to refusing to comply with the request for answers to interrogatories, Mr. Paul also failed to comply with a subpoena duces tecum personally served upon him several days before trial. The subpoena duces tecum requested that he bring with him to trial certain documents concerning his various financial activities.

The foregoing illustrates the flagrant abuse of the discovery process by Mr. Paul and his attorney. This conduct frustrated Mrs. Paul's attempts at pretrial discovery, forcing her to go to trial substantially unprepared to present her case. The importance of discovery in this case is emphasized by the majority when they accept as fact that this man, considered by the district judge to be a man of exceptional financial

ability, was reduced in worth by almost a million and a half dollars in the 16 years of the marriage. In view of the generally rising values during that period of time, I am skeptical of this conclusion and would subject it to the closest scrutiny. Because of the district court's failure to enforce discovery that court and this can only speculate as to Paul's actual worth. That the majority are only speculating is highlighted by the exercise in figures set forth in the opinion. By multiplying the $20,000 per year that Mrs. Paul is to receive by the number of years during which she *may* receive it, they arrive at a total of $680,000. Considering other payments or property which she will receive, and other payments that Paul is required to make, the majority arrive at this interesting tabulation:

| | |
|---|---|
| Total paid by husband | $750,000 |
| Total received by wife | $795,000 |

At first blush these figures, considered against the court-accepted net worth of Paul of $1,400,000, give the impression that the district court has been generous with Mrs. Paul and stringent with her husband. The majority conclude that "[n]ot only do we not find that the judge abused his discretion, but we find the distribution fair, just and judiciously contrived." 616 P.2d at 714. In actuality, however, Paul has paid out only $205,000 for the annuity, the amount necessary to set up the trust fund, or some $475,000 less than the majority would indicate. I think this is the first instance I have seen where the husband is given credit for all the money that his present payment will produce over a period of years.

The litigation appears to have been protracted, involving several states, and a number of depositions were taken. Whether this lengthy battle was due to the fault of the plaintiff or defendant does not seem to me to be important; the only thing that we must determine is whether Mrs. Paul has had a fair trial in the courts of Wyoming. I would say that it is a principle deeply engrained in our jurisprudence that the wife is entitled to approach the bar of justice as equally informed of her husband's

financial affairs as is reasonably possible. No court can take note of and give effect to all of the factors bearing upon the merits of the property disposition. Forcing one of the parties to deal from a position of ignorance with one as contemptuous of legal process as was Mr. Paul hardly makes for equal justice. Adequate discovery is the only means to that goal.

A remand for a new trial with additional time for additional discovery was entered in *Biehler v. White Metal Rolling & Stamping Corporation*, 30 Ill.App.3d 435, 333 N.E.2d 716 (1975). This was a products liability case involving a ladder claimed to be defective. The appellate court found that defendant's failure to comply with discovery orders prevented plaintiff from being able to show that defendants knew or should have known of the defective condition.

I also believe that the situation is much like that in *Boyce v. Boyce*, Utah, 609 P.2d 928 (1980). Judgment had been entered making a disposition of property that Mrs. Boyce, moving for relief under Rule 60(b), U.R.C.P. (essentially the same as Rule 60(b), W.R.C.P.), claimed was not based on a proper showing of her husband's assets. The district court found that Mrs. Boyce, before entry of the decree, had reason to believe that valuations were not correct and denied relief. The supreme court reversed, saying (609 P.2d at 930–931):

"... [D]efendant's record of noncompliance with discovery procedure and other tactics designed to prevent full disclosure, if true, is a perversion of the judicial process and will not be overlooked solely on the ground that the plaintiff is perhaps guilty of some degree of fault in not being as diligent as she might have been. A trial court, in the highly equitable matter of making a fair division of property in the context of a dispute that is often highly acrimonious and bitter, must take care that evasive stratagems not stand in the way of a just resolution. The determination of what assets are subject to the divorce proceeding may not be based on gamesmanship calculated to obfuscate the facts; the judicial system is not to be manipulated in divorce proceedings by one who actively and aggressively misleads the court and the opposing party, simply because the opposing party was in a small measure delinquent in not discovering the fraud prior to entry of a final decree."

Although, as I shall later set forth, I am not satisfied with the general arrangement by which the district court has disposed of the property of the parties, my real concern as an appellate justice is that by our decision today we cripple what to me was one of the most important and valuable concepts of the new federal rules, adopted by us in 1957. Through inadequate discovery the court has not been furnished with a proper base for its determination. I can summarize my position no better than did the Utah court when it said in *Boyce*, 609 P.2d at 931:

"In the present case, though plaintiff had a hearing, she was denied a judgment based on accurate information and full disclosure relative to the merits of her position."

If for no other reason, I would have remanded the cause for a new trial with additional time for additional discovery with imposition of such legal sanctions as are proper to that end.

### Property Settlement—Trust Fund

I also disagree with the majority's conclusion that the distribution made by the district court was "fair, just and judiciously contrived" and believe that the trial judge abused his discretion when he set up a trust fund for Mrs. Paul in lieu of awarding her a lump-sum payment representing the property division. Even though the majority failed to address the question of the propriety of the trust fund, I believe this to be the controlling question.

Mrs. Paul contends, among other things, that the trial judge erred in not requiring Mr. Paul "to immediately pay to Appellant a sum of money equivalent to her interest in the Pittsburgh residence, between $175,-000 and $200,000." The Pittsburgh residence is jointly owned by the parties and

was appraised at $415,000 before trial, and the trial judge fixed its value at $336,000. I agree with Mrs. Paul.

The trial judge's order granting the divorce provides in pertinent part:

"6. That as an equitable division of the parties' property, the Defendant shall form and maintain a trust fund with a reputable banking institution which shall pay to the Plaintiff $20,000 in interest annually, payable on June 1 of each year, for 34.2 years. Said trust fund is to begin payment to Plaintiff on June 1, 1980. At the conclusion of the 34.2 years, or upon the death of Plaintiff, whichever occurs first, the principal of said trust fund shall be transferred and set over to the parties' child, Samantha Paul.

"7. That as an equitable division of the parties' property, Defendant shall pay to Plaintiff the sum of $2,000 per month for one year. Said payments to be received by Plaintiff no later than the 1st day of each month with the first payment due on June 1, 1979, and the last payment due on May 1, 1980.

"8. That plaintiff be, and she is hereby, ordered to convey to Defendant by good and sufficient quit claim deed, all of her right, title and interest in the real property located at 116 Woodland Road, Pittsburgh, Pennsylvania, and to execute any and all other instruments necessary to effect such conveyance so that Defendant will own fee simple title to said real property."

The trial judge and this court have characterized this trust fund as a property settlement. If this is actually a property settlement such a disposition is not just and equitable as required by § 20–2–114, W.S. 1977. My understanding of a property settlement is that the property of the parties is to be divided in an equitable manner with each party being awarded a portion of that property. Each party is then free to make such disposition of their shares as they desire.

Mrs. Paul contends that the trust fund can be funded for $205,000. Whether or not this is correct, I do not know; however,

Mr. Paul has not contested this estimate. Assuming that the trust fund can be funded for $205,000, the trial judge has in essence divested Mrs. Paul of her interest in the family home replacing it with a trust that terminates upon her death.

In reviewing this court's decisions concerning property settlements, alimony awards, and child support, I have failed to find any authority upholding such a disposition. While the cases are not numerous, other courts have considered the question of whether a trial judge has the power to require that a trust fund be set up in a divorce proceedings. Of the courts that have discussed this question, some have held that such an order cannot be upheld, while others have concluded that in special circumstances, either the equitable powers of the court or the expressed or implied statutory language allow such a disposition. Annot., 3 A.L.R.3d 1170, § 2(a), at p. 1172 (1965).

In *Harden v. Harden*, 182 Okl. 364, 77 P.2d 721, 725 (1938), the court, finding that the trial judge did not have the power to create a trust fund for alimony payments stated:

"Finally, the plaintiff contends that the trial court erred in attempting to create a trust of the alimony awarded so that the income therefrom would be paid to plaintiff and the trust estate to descend to her heirs upon her death. We find no authority for such disposition of the alimony award by the trial court. The plaintiff is entitled to this alimony, and, as we have found, the sum awarded is reasonable. We must hold, however, that the trial court erred in attempting to create a special trust of the alimony awarded."

On the other hand, in *Farley v. Farley*, 227 Cal.App.2d 1, 38 Cal.Rptr. 357, cert. denied 379 U.S. 945, 85 S.Ct. 438, 13 L.Ed.2d 543 (1964), involving an action to establish a Utah divorce decree as a California judgment that was consolidated with a separate action by plaintiff's ex-husband who was seeking to have the title of the California land that had been placed in trust by the Utah court quieted, the California court

found statutory authority for the creation of the trust. The Utah divorce decree provided that the husband was to convey to his wife as trustee certain California property solely owned by the husband to be used for the support and education of the minor children. And when the children reached the age of majority, the corpus of the trust was to be divided equally among the children.

The pertinent Utah statute gave the divorce court the power to "make such orders in relation to the children, property and parties, and the maintenance of the parties and children, as may be equitable." *Farley,* supra, 38 Cal.Rptr. at 361. The California court held that the decree was valid in light of this statute to the extent that the trust fund was set up to meet the financial needs of the minor children. However, the court went on to hold that

". . . The cited Utah cases convince us that the decree is valid to the extent that it serves the above purposes during the children's minority. The decree goes farther, however. It effectively divests Mr. Farley of all interest in the land for the purpose of vesting it, or its remaining proceeds, in the children *when they reach adulthood.* The Utah court has attempted an *inter vivos* disposition of the husband's estate for the benefit of his adult children. No Utah case has been brought to our attention which lends direct or inferential support to such a disposition upon divorce; nor, in our view, may the broad language of the Utah statute be stretched to such an extreme." *Farley,* supra, 38 Cal.Rptr. at 362.

In *In re Marriage of Winter,* Iowa, 223 N.W.2d 165 (1974), the appellate court directed that an alimony award be placed in a trust fund in view of the exceptional circumstances presented by the case, including the wife's uncertain personal and economic situation. The court stated:

"* * * In the exceptional circumstances of this case, in view of Joan's uncertain economic and personal situation, and in consideration of the purposes of alimony and our desire to see those purposes achieved, we hold that award should be placed in trust . . ." 223 N.W.2d at 170.

It is important to note that in this case the appellate court not only found that exceptional circumstances warranted the creation of a trust fund, but when the trust is terminated the wife is entitled to the corpus.

Section 20–2–114, W.S.1977, supra, empowers the trial court to

". . . make such disposition of the property of the parties as appears just and equitable, having regard for the respective merits of the parties and the condition in which they will be left by the divorce, the party through whom the property was acquired and the burdens imposed upon the property for the benefit of either party and children."

While the statute does not specifically provide that the trial court has the power to order that a trust fund be established, the broad language of this statute probably allows for such a disposition. Assuming that the statutory language allows the trial court to order that a trust fund be created to secure a property settlement, the question whether this power should have been exercised in the case at bar still remains unanswered. The cases that have allowed such a disposition have done so in most cases only if the particular circumstances of the case warrant the establishment of a trust fund. As pointed out in Annot., 3 A.L.R.3d 1170, § 7, at p. 1180 (1965), "[i]t is apparent, from the paucity of cases in which the issue has been presented, that the measure is one not lightly resorted to . ."

In the case at bar there has been no showing that special circumstances require that such a trust be established. To begin with, the trust was not set up to insure the support and education of Mr. and Mrs. Paul's daughter. The record indicates that Mr. Paul is to pay $300 a month for child support and he is to also pay for the girl's college education. There is no showing that Mr. Paul is likely to fail to meet these obligations. Furthermore, there is no showing that Mrs. Paul is incapable of han-

dling her own financial affairs. Even if this were so, I would still question the power of a court in a divorce action to dole out monthly payments representing the property settlement to insure that one party does not spend the money awarded to her unwisely. This is simply not the role of a divorce court.

· Not only do I object to the trust fund, I also object to the transfer of the corpus to the daughter when the trust is terminated. As was said in *Feldmann v. Feldmann*, 166 Kan. 699, 204 P.2d 742, 748 (1949), "the general rule is that in granting a divorce a court has no authority under the statute to decree that a part of the property of the husband shall be the sole property of his children." Likewise, in *Giambrocco v. Giambrocco*, 161 Colo. 510, 423 P.2d 328, 331 (1967), the trial court's order requiring the wife to convey her half-interest in residential property to a trust for the benefit of the children was found to be invalid by the Colorado Supreme Court. In so holding, the court stated:

"Accordingly, we hold that the trial court's order with reference to the creation of a trust, requiring the plaintiff to convey her half-interest in the residential property belonging to both the parties for the benefit of their children, is beyond the jurisdiction of the trial court, and clearly invalid." 423 P.2d at 331.

Even if this court determines that § 20–2–114, W.S.1977 allows the trial court to order that certain property be awarded to the children in a divorce action, I believe a correct interpretation of the statutes requires that such action may be taken only under special circumstances. The pertinent part of § 20–2–114 provides that in arriving at a just and equitable property settlement the trial court must "consider the burdens imposed upon the property for the benefit of either party and children." This language is ambiguous and, therefore, we must consider the intent and purpose of the statute and then give effect to that intent. *State ex rel. Albany County Weed and Pest District v.Board of County Commissioners of County of Albany*, Wyo., 592 P.2d 1154, 1157 (1979).

In my opinion, the legislature included this language in the statute not for the purpose of giving the trial judge the power to direct a parent to give a child a share of his or her estate, but rather to insure that support and education of minor and incompetent children will be provided for after the divorce. As aptly stated by the Colorado Supreme Court in *Menor v. Menor*, 154 Colo. 475, 391 P.2d 473, 477 (1964):

"* * * The trial court was without authority to direct that James must give to each of his children a share in a future estate which he may or may not acquire. The obligation of the defendant is to provide reasonable support for his children according to their need, within the range of his ability. A father of children is under no obligation to settle any property upon his children, or to deed them an interest in any asset. On the contrary he may by will or deed or other voluntary act disinherit a child if he sees fit to do so . . ."

Accordingly, had I been writing for the majority, I would have held that the trust fund is invalid in two respects. First, there was no showing of exceptional circumstances warranting the creation of the trust fund for the payment of the property settlement and, also, the trial court did not have the authority to require that the corpus of the trust fund be given to the daughter upon the termination of the trust.

## APPENDIX

Excerpt from Motion for Sanctions, filed April 13, 1979:

"a. Interrogatory 1 asks for the net and gross income Defendant received each year of his marriage to Plaintiff. Defendant received income from P.E.I. Corporation and Hesgon Corporation during his marriage. Defendant answered the question only for the year 1976 and only for income from P.E.I. during 1976. No answer was given for 1964 through 1975 or for 1977 and 1978 for P.E.I. and no answer was given for 1974 through 1978 concerning Hesgon. Defendant stated that the answers were given in a deposition taken on August 31, 1978, in Pittsburgh, Pennsylvania, (which Defend-

ant has filed herein) but the answers are not contained therein. (See Exhibit 'E', page 17, line 8 through page 21, line 13).

"b. Interrogatory 1 requests income tax returns for 1963 through 1978. Defendant failed to produce said documents and had not contacted the Internal Revenue Service in an attempt to obtain copies. (See Exhibit 'E', page 21, line 14 through page 21, line 22).

"c. Interrogatory 2 requested the amount of or consideration for any mortgage. Defendant testified that he had a mortgage on a condominium in Brownsville, Texas, but refused to give the amount of or consideration for the mortgage. Defendant stated that the information was contained in his August 31, 1978, deposition taken in Pittsburgh. That deposition does not contain the answer. (See Exhibit 'E' page 32, line 13 through Page 32, line 24).

"d. Interrogatory 2 requested the original amount, rate of interest and unpaid balance of all mortgages of Defendant. Defendant refused to answer these questions as pertaining to the mortgage on the Brownsville, Texas property. Defendant stated that he had documentation that would supply these answers, but he did not bring it with him. (See Exhibit 'E' page 34, line 13 through page 35, line 23).

"e. Interrogatory 3 requested information concerning money owed to Defendant. Defendant stated that Plaintiff's son owed him money for educational expenses. The Defendant failed to answer the amount owed, stating it was documented but he did not bring the documentation with him and had not looked at it prior to coming to the oral answers. (See Exhibit 'E' page 42, line 16 through page 43, line 14).

"f. Interrogatory 4 requested information concerning money owed to any entity in which Defendant has an interest. Defendant stated that this information was in his August 31, 1978, Pennsylvania deposition and in his Arkansas deposition of February 19, 1979. (See Exhibit 'E' page 45, line 25 through page 46, line 17). Defendant failed to produce a copy of the Arkansas deposition. Plaintiff has reviewed both depositions and can not find the answer to this question therein. .

"g. Interrogatory 5 requested, among other things, the original purchase price and value of any automobiles of Defendant and the person or firm from whom it was purchased. Defendant stated that the original value of his Lincoln Continental was testified to in his August 31, 1978 Pennsylvania deposition. Furthermore, Defendant stated that he could not recall the purchase price or the firm from whom he purchased the Lincoln. Defendant failed to provide documentation concerning any of these points. (See Exhibit 'E' page 49, lines 4 through 12).

"h. Interrogatory 5 also requested information concerning Defendant's aircraft, including value at date of purchase, firm purchased from, original purchase price, and total amount of payments made. Defendant stated that the original value and purchase price were answered in his Pennsylvania deposition of August 31, 1978. Said deposition does not contain that information. Defendant failed to give the name of the firm from whom he had purchased his aircraft, even though he had documentation on the issue. Defendant also refused to testify to the total amount of payments made. (See Exhibit 'E' page 51, line 16 through page 53, line 4).

"i. Interrogatory 6 requests information concerning Defendant's furniture or household goods. Defendant totally failed to answer this Interrogatory. Defendant stated that he had been to his home since the Interrogatories were served but failed and refused to even provide the Plaintiff with a list of furniture. Defendant also refused to give even an estimated value. (See Exhibit 'E' page 53, line 11 through page 58, line 24).

"j. Interrogatory 7 requests information concerning Defendant's business enterprises during his marriage, including the annual gross profits during the years 1963 through 1978. Defendant stated that all answers had been given in his

August 31, 1978 Pennsylvania deposition, his February 19, 1979 Arkansas deposition, and Court hearings in Pennsylvania. (See Exhibit 'E' page 58, line 25 through page 62, line 18). The September 'support' hearing in Pennsylvania has never been transcribed (as described above) and, therefore, Plaintiff does not have that information. A review of the Pennsylvania and Arkansas depositions reveals that the Defendant has never testified concerning the annual gross profits of his business enterprises.

"k. Interrogatory 9 requests information concerning stocks that Defendant has purchased during his marriage. Defendant stated that he had previously answered this interrogatory in testimony in Pittsburgh, Pennsylvania and El Dorado, Arkansas. (See Exhibit 'E' page 65, line 23 through page 66, line 13). Of course, the September, 1978 'support' hearing was never and will never be transcribed. A review of Defendant's August 31, 1978 Pennsylvania deposition and his February 19, 1979 Arkansas deposition reveals that Defendant has not testified concerning this information in either of those depositions.

"l. Interrogatory 14 requests information concerning any interest of Defendant in any parcel of real property, including the present value of the real estate. Defendant answered that all the information had been given in prior depositions and Court proceedings. (See Exhibit 'E' page 70, line 14 through page 71, line 24). Remembering that the September, 1978 'support' hearing is not and will not be transcribed, a review of all previous oral testimony discloses that Defendant has never testified concerning the present value of the parties' property located at 116 Woodland Road, Pittsburgh, Pennsylvania or the property located in Dubois, Wyoming.

"m. Interrogatory 16 requests information concerning sales of real property made by Defendant including the legal description. Defendant stated that he had previously testified concerning this information, except for the legal description. Documentation was available to Defendant, but he refused to acquire or produce the same. (See Exhibit 'E' page 72, line 20 through page 73, line 24).

"n. Interrogatory 17 asked whether any person, firm or other entity held any property in trust for the benefit of Defendant. The information requested included the name and address of trustees, complete description of the property, and the present value of the property. Defendant stated that this information had been given in his Pennsylvania and Arkansas depositions and in Pennsylvania Court proceedings. (See Exhibit 'E' page 74, line 7 through page 75, line 4). A review of all transcribed testimony reveals that Defendant has never testified concerning the names and addresses of trustees, description, and present value of property held in trust for Defendant in Mexico.

"o. Interrogatory 23 requests information concerning property, money or assets which Defendant claims are his separate property and not subject to division. Defendant stated that he previously testified concerning this issue. (See Exhibit 'E' page 78, line 24 through page 79, line 9). Upon review of all previous testimony of Defendant, Plaintiff can not find any answer to this Interrogatory.

"p. Interrogatory 24 refers to the sale of 'separate property' by Defendant. Defendant stated that he had previously testified to all of said Interrogatory. (See Exhibit 'E' page 79, line 10 through page 79, line 18). A review of all of Defendant's previous transcribed testimony reveals that Defendant has never testified as to this issue.

"q. Interrogatory 28 requests information concerning any written or recorded statements obtained by Defendant. Defendant stated that there may be statements, other than what he has previously produced, but had not gone completely through his papers and could not produce the same. (See Exhibit 'E' page 83, line 19 through page 85, line 14).

"r. Interrogatory 29 requests information concerning any outstanding debts, liabilities or other obligation contracted by Defendant during his marriage (which

had not been discussed in previous interrogatories). Defendant testified that he was sure there were others, but he could not give a list of them because he had not gone through his papers before appearing at the oral answers. (See Exhibit 'E' page 85, line 16 through page 86, line 7).

"s. Interrogatory 30 requests information concerning funds received by Defendant during the parties' separation. Defendant testified that he could not give a list. Furthermore, he had documentation from which to answer, but he had not looked at it prior to appearing for the oral answers and did not produce the documentation at the time of the answers. (See Exhibit 'E' page 86, line 8 through page 87, line 13)."