2005 WY 39

**Jim W. STOKER, Appellant (Defendant),**

v.

**Tina STOKER, Appellee (Plaintiff).**

**No. 04–96.**

Supreme Court of Wyoming.

April 7, 2005.

Representing Appellant: John D. Bowers of Bowers & Associates Law Offices, PC, Afton, Wyoming.

Representing Appellee: Kenneth S. Cohen, Jackson, Wyoming.

Before HILL, C.J., and GOLDEN, KITE, and VOIGT, JJ., and SKAVDAHL, D.J.

VOIGT, Justice.

[¶ 1] The appellant, Jim W. Stoker (the husband), and the appellee, Tina Stoker (the wife), were married in 1995 and divorced in 2002. In the divorce proceeding, the district court awarded the wife a judgment equivalent to one-half of the appraised value of real property known as the "dry farm." On appeal, the husband essentially argues that the district court failed adequately to consider all of the factors listed in Wyo. Stat. Ann. § 20–2–114 (LexisNexis 2003) in disposing of the dry farm property. We find that the district court did adequately consider these factors, and affirm.

## ISSUE

[¶ 2]   Whether the district court adequately considered the factors listed in Wyo. Stat. Ann. § 20–2–114, and ultimately whether the district court's consideration of such factors led to a just and equitable property division under the circumstances of the instant case?

## FACTS

### The Parties' Marriage and Divorce

[¶ 3]   When the wife met the husband, she was unemployed, renting a trailer, "on welfare," was not receiving child support, and her possessions consisted of household items and utensils, her children's property, and a car.   The husband and wife then lived together in the husband's home for about two years prior to their marriage on July 27, 1995.   The husband had "a couple" children from a previous marriage[1] and the wife had three minor children from a previous relationship.[2]   However, no children were born to the husband and wife.

[¶ 4]   During her marriage to the husband, the wife testified that she: (1) was employed at least forty hours per week and earned an average wage of $7.00 per hour; (2) performed the housework, cooked, did the laundry, and cared for her children; (3) paid ninety-five percent of the utilities (telephone bill, electric bill, propane bill (although the husband sometimes traded his services for propane)); (4) purchased the groceries and the wood to heat the residence; and (5) made between one and three payments of $158.00 for the husband's tractor loan, when the lender was unable to contact the husband. The wife's parents also "often paid the bills for [the husband and wife's] house, utilities, water, lights, propane and clothing" because "they would be turned off and have to have a deposit before they'd turn them back on" and "[the husband and wife] had to have a telephone and they had to have heat."

1.   The husband had been married twice prior to his marriage to Tina Stoker.

2.   Two of the wife's minor children resided with the husband and wife during their marriage, and the third child lived with the husband and wife during part of their marriage.

[¶ 5]   It further appears from the record that, during the marriage, the husband: (1) was a farrier, raised and cared for horses, and trained race horses in Casper for six weeks over a "couple" of summers; (2) provided a residence for the wife and her children; and (3) paid the water bill and the insurance for the residence.   The wife testified that the husband never declared income for tax purposes (the wife filed an individual return during the marriage), used his income primarily to feed and maintain his horses (as opposed to "buying new furniture," for example), did not send money home when he worked in Casper,[3] and did not support her children.

[¶ 6]   In 1998, the husband "got in [a] bind with the bank" regarding the real property on which the aforementioned residence was situated.   According to the wife's mother, the property "was going to be foreclosed on and ... [the husband, wife, and the wife's children] would be out in the street within two weeks."   The husband "trusted" the wife's father to help him, and the wife's father made financial arrangements to "have this paid off so that they wouldn't be out in the street."   The property was apparently quitclaimed to the wife's parents so that they could obtain a loan in order to retire the indebtedness.   The wife's mother testified that at the time, she further informed the husband and wife that the property would be returned to them if they

> would stop their drinking and show that they could make a go of the farm, pay their taxes and their bills and have a family oriented home or it would be a cold day in hell before I gave it back to them. And I gave them six months to do it.

[¶ 7]   At some point, a sale of about eight acres of the property was contemplated. That portion of the property was listed with a realtor for seven months and ultimately sold for $70,000.00.   All but approximately $43,000.00 of the sale proceeds was used to

3.   The husband testified that he did send money home from Casper, but did not know "where it went...."

satisfy the financial obligations incurred by the husband and wife. A lawsuit ensued between the husband and his in-laws regarding the remaining property and the proceeds from the sale of the eight-acre parcel. The lawsuit was apparently settled—the remaining real property (including the residence) was transferred to the husband,[4] and the wife's parents kept the remaining sale proceeds.[5] The husband admitted that the wife and her family got him out of a "tight spot," but added that he felt he had "paid dearly for it."

[¶ 8] The wife's mother also submitted approximately $22,000.00 in checks issued by the wife's parents between 1996 and 2003 as "examples" of payments they made directly on behalf of the husband, the wife, and the wife's children. The testimony, and the checks, reflect payments for upkeep of the residence and real property, utilities, propane, the children's doctor bills, property taxes for the husband's property, school expenses, clothing, wife's vehicle license, satellite television, groceries, cash, legal fees on behalf of the wife and her parents, and other items. A good portion of these payments were made from the aforementioned $43,000.00, but some expenditures obviously occurred prior to the existence of those proceeds.

[¶ 9] In October 2001, the wife filed for a divorce due to "[i]rreconcilable differences." The wife testified that she was tired of the husband "coming home drunk and being abusive" and that after the husband had been drinking he would be in a "bad mood" and want to "start yelling, fighting." According to the wife, the husband physically "grabbed" her more than once during the marriage and after one incident in which the husband "pushed [the wife] against the wall and grabbed ahold of [the wife's] neck to choke" her in the presence of her youngest child, the wife sought, and received, a restraining order.[6] The wife acknowledged that at one time she had a drinking problem, but she completed rehabilitation and had not had a drink since May 26, 1999.

[¶ 10] The husband alleged that the wife had a relationship with another man, which caused the irreconcilable differences between the husband and wife. The wife testified that she met another man through her employment and visited him at hotels (where he was staying for work purposes) to watch videos. The wife denied that she had an affair with the other man, denied that she ever had "intimate relations" with the other man, and testified that she and the other man were seeing each other as "friends."

[¶ 11] The district court entered a divorce decree in December 2002.

### The Dry Farm Property

[¶ 12] The dispute in the instant case focuses on the district court's disposition of real property known as the "dry farm." Historically, the husband's family owned and operated a 203–acre farm and/or ranch near Thayne, Wyoming, and the husband purchased the property in 1968. In 1990, the husband sold a 150–acre portion of the property known as the "dry farm" to Ray Johnston, apparently to satisfy a judgment resulting from the husband's divorce from a previous wife.[7]

[¶ 13] The husband testified that as early as 1993, he discussed the possibility of selling a twenty-acre parcel of his property to the local school district, and re-acquiring a portion of the dry farm property from Ray Johnston.[8] Six or seven months after the

---

4. The property was by that time unencumbered, and the parties agreed that it was not to be considered "marital property" per se, but the district court could consider the results of the settlement in disposing of the dry farm property that is at issue in this appeal.

5. The wife apparently had no right to these proceeds, but again, the parties agreed that the district court could consider this in disposing of the dry farm property.

6. The husband apparently stipulated to the restraining order without an evidentiary hearing. The choking incident occurred after the husband saw the wife's car at the motel wherein the wife's male "friend" was staying.

7. The previous wife's name appeared on the deeds to the dry farm property during her marriage to the husband.

8. The husband and wife were apparently living together at this time.

husband and wife were married, a Section 1031 exchange was finalized, wherein the school district acquired the twenty-acre parcel from husband and husband used the proceeds to re-acquire two parcels (totaling forty-eight acres) of the dry farm property from Ray Johnston for $143,414.00. The wife testified that the husband discussed the negotiations with her, but she did not contribute money to the transaction and was not formally involved in the negotiations.

[¶ 14] Apparently, the two parcels acquired in this exchange were deeded to "Jim W. Stoker and Tina Stoker, husband and wife, as tenants by the entireties." The wife testified that her name was included in the deeds because the seller executed the deeds as such—it "happened" because "[w]e were married"—and the wife was never asked to enter a prenuptial or postnuptial agreement regarding the property. The husband also testified that the seller included the wife's name on the deeds essentially "because I was married to her for, like, six months," and the husband had not requested that the seller exclude the wife's name from the deeds. According to the husband, he and the wife "never talked about" the wife's interest in the property prior to the marriage, and there was no agreement prior to, or after, the marriage that the wife would not have an interest in the property.

[¶ 15] The husband testified that he trained horses for a "couple years" on the forty-eight-acre dry farm property and also leased it to another individual "on shares" of hay for a "couple years" in order to feed husband's horses. The wife testified that during the marriage, she would ask if the husband needed any help on the dry farm property and run errands "or bring him things or help him fix things on the land," [9] and that she contributed "toward keeping the dry farm property as marital property." At some point, the wife discovered a tax notice regarding the dry farm property. The property had apparently been sold because of delinquent property taxes in July 1998, and the wife's parents redeemed the property in

January 1999 by paying $104.25 in property taxes. The wife testified that the husband previously "had the same problem. . . ." The wife's parents proceeded to pay the property taxes on the dry farm property from 1999 to November 2003.

[¶ 16] The district court conducted a hearing regarding the disposition of the forty-eight-acre dry farm property in December 2003.[10] The parties stipulated that at that time, the property was valued at $240,000.00 to $340,000.00. At the hearing, the district court ruled from the bench, finding that the husband "has land but not much money," and as follows:

Actually, it boils down to this. In terms of where I look at it from the starting point is was there a gift intended when Tina's name was put on the property? The property was titled such at that time. The Court takes note of the following factors: Mr. Stoker had knowledge from prior marriages and—or at least there was evidence of it. . . .

He has children from prior marriages but he set the thing up in 1996 to where if Tina survived him, his other children would be disinherited because it was a tenancy by the entirety and everything would have gone to her. Now, that's a significant legal fact in the Court's mind.

In terms of—obviously, you know, they lived together for two years, evidently, trying to decide if they could make it and then they got married. And it's true. Jim provided at least from—essentially, at the time they got married, he had his home and the property that was sold to the school district and that was basically it, plus probably some horses and tack and farm equipment. He sold the school district property and used the proceeds to get the dry farm property. This dry farm property, that occurred at that point in time and he put her name on it.

So, you know, the one thing—and these cases are instructive that have been provided. The law presumes a gift, you know,

---

9. The husband denied that the wife ever worked on the dry farm property.

10. The hearing had apparently been delayed pending a resolution of the aforementioned lawsuit between the husband and his in-laws.

if there was no evidence that it was otherwise. And there really was no testimony as to why her name was put on it, so that presumption remains. And then I look at the background facts on the thing and that and it could have easily been put in his name or otherwise. So we're—the starting point is if there's a presumption of that.

Now, I go into it and look at it from the standpoint of, okay, what are the equities? We've got this property here that's essentially 50/50. It looks like, first of all, out of the whole thing, the home property has gone back to Jim. He's got that free and clear. Secondly, the thing that I look at in the course of the marriage is while you have these things and people have their faults—and that may be why the other person loves them, is because of their faults. It makes them—You know, so to tell you the truth, I don't look at it, maybe, as harshly as clients and Counsel wish I would because we all have our shortcomings.

But this is essentially what it appears to me, based on what's gone on. I mean, shortly after they were married, they started having financial problems on this loan on the home. It's pretty clear that Tina was the worrier, was the person who tried making sure that there was—the bills were paid; there was heat in the house; there was food on the table. She worked forty hours a week to do that, which is a full-time job. It may not be the most money, but she did the best she could.

Jim, on the other hand, he worked full-time in the horse racing game and he's good at that and everything but evidently from the testimony here, it doesn't really return much money.... But it may be that one of the things that attracted Tina to Jim is that she worried about things and took care of those details and that's the kind of wife he wanted.

The other equity, I guess, the main thing that I look at is he did keep these children, her children, while she was not receiving any child support. But on the other hand, probably the cost of upkeep was primarily paid for through Tina's income. So it doesn't come out all that great for Jim.

Mainly, he used his income that he received from the dry farm, he took the income from the dry farm and what he got from his horse racing and training and, apparently, plowed that back into his occupation as a trainer of the horses.

So in terms of it all, as I look at it, Jim's got his home back. He's still got the situation with regard to the ... dry farm property. I'm here, looking at it from the standpoint of, okay, what equities do we have to offset that? Quite frankly, in terms of the traditional function of trying to keep a home together and everything else, the equities go in favor of Tina. There could be an argument that she should be awarded more than half, if we start out from the premise that she had half given to her, but I'm not going to do that.

I am awarding her half of the property.

. . .

But given where we are, this is one of these things, Jim, that I don't know what else I can do. You know, your case is basically that you made a fool's bargain when you made that deed. And I understand where it's at, but those are significant acts. And once that's done, the only thing I'm doing is looking at the equities to try to divide it up any other way, to depart from that, and I've already explained that.

[¶ 17]  The district court subsequently entered a formal decree in February 2004, in which decree it additionally found as follows:

1.  Wife "contributed to the marriage through payment of household expenses, utilities and arranging for payment of other debts during the course of the marriage," and husband "contributed to the marriage through payment of some marital expenses and providing a home for [wife] and her children"; and

2.  Husband did not produce sufficient evidence "to overcome the presumption that [husband] intended to give a fifty percent interest" in the dry farm property to wife.

[¶ 18]  Rather than granting the wife an actual interest in the property, the district court awarded the wife a $170,000.00 money

judgment equivalent to one-half of the property's stipulated value.[11] The decree provided that if the money judgment is not paid by a date certain, the property is to be appraised and sold; if the property is appraised and sold for less than $340,000.00, the wife will receive one-half of the sale proceeds and if the property is appraised and sold for more than $340,000.00, the wife will receive the judgment amount (plus interest). The husband now appeals the district court's disposition of the dry farm property.

## STANDARD OF REVIEW

[¶ 19]   In *Hall v. Hall*, 2002 WY 30, ¶¶ 12, 14, 40 P.3d 1228, 1230 (Wyo.2002), we stated:

Decisions regarding the division of marital property are within the trial court's sound discretion, and we will not disturb them on appeal unless there was an abuse of discretion. *Davis v. Davis*, 980 P.2d 322, 323 (Wyo.1999). An abuse of discretion occurs when the property disposition shocks the conscience of this court and appears to be so unfair and inequitable that reasonable people cannot abide it. *Id.*
. . .
The trial court possesses a great amount of discretion in dividing marital property. A just and equitable division of property is just as likely not to be equal. *Carlton v. Carlton*, 997 P.2d 1028, 1032 (Wyo.2000). Although the trial court cannot divide the property in such a way that it would punish one of the parties, it may consider fault of the respective parties, together with all other facts and circumstances surrounding the dissolution of the marriage in dividing a couple's marital assets. 997 P.2d at 1034. We are required to limit our review of the record to an evaluation of whether the trial court's decision was supported by sufficient evidence, and we afford to the prevailing party every favorable inference while omitting any consideration of evidence presented by the unsuccessful party. *Id.* Findings of fact not supported by the evidence, contrary to the evidence, or

against the great weight of the evidence cannot be sustained. *Id.*

## DISCUSSION

■ [¶ 20]   The husband contends that the district court failed adequately to consider all of the factors listed in Wyo. Stat. Ann. § 20–2–114, and asks that we remand the case to the district court for reconsideration of these factors. He argues that if the district court had evaluated the evidence according to the requisite statutory factors, the wife would not have received any interest in the dry farm property because:

1.   Wife shared some fault for the divorce by virtue of her own drinking problem and her relationship with another man.

2.   Wife entered the marriage "on welfare and renting a trailer house with her three" children. Husband brought a family ranch into the marriage, has remained a rancher, and will lose "a good portion of the ranching operations" to satisfy the judgment for the wife's benefit in this case.

3.   Husband brought all of the real property into the marriage, and wife did not contribute to the purchase of the dry farm property or negotiate for its purchase. At most, wife paid "for some of the family necessities for her and her children." Wife's family also received $43,200.00 from the sale of other parcels of husband's property.

4.   The length of the marriage was only six years, no children were born of the marriage, and no other significant property was acquired during the marriage.

[¶ 21]   The husband concludes that the district court either based its decision solely on the so-called "gift presumption" and therefore failed properly to weigh all of the relevant statutory factors, or the district court sought to punish the husband for alleged misdeeds during the marriage.

■ [¶ 22]   It is undisputed that the dry farm property was subject to distribution by the district court.[12] Wyo. Stat. Ann. § 20–2–

---

11.   The husband does not question the district court's use of the higher value in arriving at this figure.

12.   Indeed, property "may be awarded to one spouse even though it was the separate property of the other" and a "just and equitable division of property in a divorce case may consider a

114 provides, in pertinent part, with respect to the disposition of marital property:

> In granting a divorce, the court shall make such disposition of the property of the parties as appears just and equitable, having regard for the respective merits of the parties and the condition in which they will be left by the divorce, the party through whom the property was acquired and the burdens imposed upon the property for the benefit of either party and children.

"There are no specific guidelines as to how much weight is given to each of the factors;" the "trial court has the discretion to determine what weight should be given each of these individual factors." *Barney v. Barney*, 705 P.2d 342, 346 (Wyo.1985); *Wallop v. Wallop*, 2004 WY 46, ¶ 26, 88 P.3d 1022, 1030 (Wyo.2004). There are " 'no hard and fast rules' governing property divisions." *Paul v. Paul*, 616 P.2d 707, 712 (Wyo.1980) (*quoting Young v. Young*, 472 P.2d 784, 785 (Wyo. 1970)).

[¶ 23] We find that the district court sufficiently considered the requisite statutory factors in disposing of the dry farm property. The district court clearly considered the respective merits of the parties. "Merit is deservedness, goodness." *Grosskopf v. Grosskopf*, 677 P.2d 814, 819 (Wyo.1984). The district court considered the evidence regarding each party's fault in the dissolution of the marriage, but noted that "we all have our shortcomings" and did not appear to attach much significance to that evidence.[13] The district court also commented extensively re-

garding each party's role in, and contributions to, the marriage and the property. In finding that the wife's contributions included "arranging for payment of other debts during the course of the marriage," the district court further recognized the considerable evidence of contributions by the wife's parents to the marriage and to the property.[14] The district court then contrasted the "equities" of the two parties and concluded that such equities favored the wife.

[¶ 24] It is also apparent that the district court considered the condition in which each party would be left by the divorce. The district court: (1) specifically referred to the husband's assets prior to, and during, the marriage, and the implications of the settlement of the lawsuit between the husband and his in-laws;[15] (2) noted that the husband essentially had land but not much money; and (3) structured the judgment, after much contemplation as to how it would affect the parties, in a way that allowed the husband an opportunity to retain the dry farm property if he wished.[16] Not even the husband felt that the wife should be left with nothing following the divorce.

[¶ 25] Contrary to the husband's appellate argument, the district court also clearly considered the party through whom the dry farm property was acquired. The parties presented extensive evidence and argument on the derivation of the dry farm property[17] and the district court expressly referred to that evidence on the record during the hearing[18] and again while explaining the ratio-

---

spouse's separate property." *Barney v. Barney*, 705 P.2d 342, 345 (Wyo.1985). *See also Metz v. Metz*, 2003 WY 3, ¶ 8, 61 P.3d 383, 386 (Wyo. 2003).

13. This would seem to undermine the husband's contention that the district court sought to punish the husband for misdeeds during the marriage.

14. The husband does not argue that it was improper for the district court to consider such evidence.

15. In addition to the references contained throughout the district court's ruling, the following colloquy occurred during the hearing:

> THE COURT: Okay. And your point, [the husband's counsel], is the [wife's] parents are

giving [the sale proceeds] to [the wife], so I should take that into account in this divorce case?
> [HUSBAND'S COUNSEL:] Yes, your Honor. . . .

16. This is precisely what the husband requested in the event the district court ruled in the wife's favor.

17. *See Karns v. Karns*, 511 P.2d 955, 956 (Wyo. 1973) (trial court advised "as to the derivation of the various properties, and in the absence of any showing to the contrary we must assume that the court gave proper consideration to that factor").

18. The following colloquy occurred between the district court and the husband's counsel:

> THE COURT: . . . So that's all we're really fighting about, is over the dry farm property.

nale for its decision. The following discussion from *Breitenstine v. Breitenstine*, 2003 WY 16, ¶ 9, 62 P.3d 587, 590–91 (Wyo.2003) appears to be analogous:

> A reading of [Wyo. Stat. Ann. § 20–2–114] indicates that the party through whom the property was acquired is **one** of the multiple factors the trial court considers in determining the appropriate division of property. In *McCulloh* [*v. Drake,* 2001 WY 56, ¶ 15, 24 P.3d 1162 (Wyo.2001) ], we made it clear that property inherited by one party **can** be awarded to the party by whom it was inherited or given. *McCulloh,* at ¶ 15. But we did not hold that property inherited by one spouse must always be awarded to the spouse that received it. . . . We have never established bright line rules for the disposition of a gift or inheritance, and we do not do so now. Instead, we, review whether the trial court considered the appropriate factors in making the disposition. The particular circumstances of the case dictate the property distribution.

(Emphasis in original.) That the district court did not weigh this factor as heavily as the husband would have preferred is not determinative.

[¶ 26] With respect to the burdens imposed on the property for the benefit of either party, we note that "[j]oint ownership of property resulting from a demonstrated intent to share is a 'burden imposed upon the property for the benefit' of both owners; the statute directs consideration of this burden as one factor." *Paul,* 616 P.2d at 712 (quoting *Beckle v. Beckle,* 452 P.2d 205, 208 (Wyo. 1969)). *See also Harkins v. Harkins,* 917 P.2d 176, 177 (Wyo.1996) and *Klatt v. Klatt,* 654 P.2d 733, 735–36 (Wyo.1982). The district court clearly emphasized this factor in its decision, but also evaluated this factor in the context of the parties' respective merits

> And I gather from what I was looking at here, [husband's counsel], what you're saying is . . . that this dry farm property was something that was owned by . . . [husband] before the marriage and then he somehow sold it and then got it back or something?
> [HUSBAND'S COUNSEL:] Yeah. . . .

19. The husband also contends that if it was appropriate for the district court to apply this pre-

and through whom the dry farm property was acquired.

[¶ 27] According to the husband, the "gift presumption" the district court relied upon in this regard is "inconsistent" with Wyo. Stat. Ann. § 20–2–114 because the statute states that the district court "shall" have "regard for" the "party through whom the property was acquired. . . ." However, this Court has previously considered the "gift presumption" in reviewing the disposition of property pursuant to Wyo. Stat. Ann. § 20–2–114. For example, in *Tyler v. Tyler,* 624 P.2d 784, 785 (Wyo.1981), the husband and wife had entered an antenuptial agreement "which provided for separate ownership, enjoyment and disposal of their separate properties, whether acquired before or during their marriage." We stated the "general rule that when title to real property is taken in the name of both spouses and the consideration therefor is furnished by only one of them, there is a rebuttable presumption that a gift of one-half interest therein is intended for the other spouse . . ." and found sufficient evidence "to support the district court's finding that a gift of one-half of the property was intended and made by husband to wife." *Id.* at 785–86.[19]

[¶ 28] In *Tyler,* 624 P.2d at 786–87, the husband similarly argued

> that even if wife owned the property jointly with him, the district court abused its discretion in awarding one-half of the property to wife inasmuch as it was paid for entirely by husband, and that the spirit of the antenuptial agreement would be accomplished only by awarding all ownership of the property to husband. He points to § 20–2–114, W.S.1977 in support of his argument, stressing the direction therein that regard should be given to "the party through whom the property was acquired."

(Footnote omitted.) We responded as follows:

> sumption, the presumption was rebutted in the instant case because there was never an express agreement or promise that the wife was to receive a one-half interest in the dry farm property. This argument does not accurately characterize the totality of the evidence presented on the issue, and undermines the very purpose of having such a presumption, especially in light of that evidence.

However, the element having to do with the party through which the property was acquired is only one of several elements set forth in the statute for consideration by the trial court. The other elements there set forth are to receive like consideration, e.g., condition in which the parties will be left by the divorce and merits of the parties.

In the final analysis, the district court disposed of the interests of husband and wife in accordance with the antenuptial agreement (treating each party as owning one-half interest in the property). Husband retained his separate properties, and wife retained hers.

. . .

The district court did not here abuse its discretion.

*Tyler*, 624 P.2d at 787. *See also Wallop*, 2004 WY 46, ¶¶ 14–32, 88 P.3d at 1028–32 and *Barton v. Barton*, 996 P.2d 1, 3–5 (Wyo. 2000).

■ [¶ 29] We therefore conclude that the district court adequately considered the requisite statutory factors in disposing of the dry farm property. The husband's appellate argument primarily concerns the weight the district court placed on each factor according to the husband's particular view of the evidence. "Our function is not to reconsider or retry the district court's decision unless the exercise of discretion results in a clearly unjust and inequitable determination." *Barney*, 705 P.2d at 344; *see also Piper v. Piper*, 487 P.2d 1062, 1064 (Wyo.1971). The husband has failed to demonstrate that, when viewing the evidence in a light most favorable to the wife, the district court abused its discretion in disposing of the dry farm property. *See generally McLoughlin v. McLoughlin*, 996 P.2d 5, 6–8 (Wyo.2000); *Mann v. Mann*, 979 P.2d 497, 499–500 (Wyo. 1999); *Harkins*, 917 P.2d at 177–78; and *Winterholler v. Winterholler*, 486 P.2d 232, 233–34 (Wyo.1971).

[¶ 30] We affirm.