2005 WY 140

**Cynthia Louise DeJOHN,
Appellant (Plaintiff),**

v.

**Kenneth David DeJOHN, Appellee
(Defendant).**

**No. 05-36.**

Supreme Court of Wyoming.

Oct. 26, 2005.

Rehearing Denied Nov. 22, 2005.

Representing Appellant: C.M. Aron of Aron and Hennig, LLP, Laramie, Wyoming.

Representing Appellee: Daniel E. White and Sasha M. Johnston of Woodard & White, P.C., Cheyenne, Wyoming.

Before HILL, C.J., and GOLDEN, KITE, VOIGT, and BURKE, JJ.

HILL, Chief Justice.

[¶ 1] Appellant, Cynthia Louise DeJohn (Wife), contends that the district court abused its discretion in dividing the parties' marital property. Appellee, Kenneth David DeJohn (Husband), asserts that the property division was well within the district court's broad discretion in such a matter.

## ISSUES

[¶ 2]   Wife poses these issues for our consideration:

1. In a marital dissolution, whether it is an abuse of discretion to treat marital joint property—including the parties' home—as the equivalent of Husband's pre-marital property holdings.

2. In a marital dissolution, whether it is an abuse of discretion to disregard the Wife's share of ownership in the parties' marital home and other assets in joint names.

Husband simply contends that the distribution of property does not constitute an abuse of discretion.

[¶ 3]   In her reply brief, Wife asserts that Husband's brief raised these additional issues:

1. Whether Husband was actually employed during the marriage.

2. Whether Husband can assert a prenuptial agreement.

3. Whether Husband can assert an estate plan to avoid gifts of joint property.

4. Whether Wife operated the parties' mobile home park.

5. Whether Husband has falsely attacked Wife's credibility.

## FACTS AND PROCEEDINGS

[¶ 4]   The parties do not dispute that they were married on July 30, 1993, and that they informally separated in January of 2003. At the time of the divorce proceedings, Wife was 49 years old and Husband was 56. A decree of divorce was entered on November 24, 2004.

[¶ 5]   During the course of his working career, Husband earned several million dollars working in the high-tech industry. Wife worked throughout her adult life prior to the marriage, and had both an undergraduate degree in business and a Masters of Business Administration from the University of Colorado, although she had never really been employed outside the marriage so as to make significant use of her college degrees.

[¶ 6]   The parties were first acquainted when both worked at Storage Technology, but became friends while Wife worked for the Mountain Man Fruit and Nut Company in the Boulder area, and Husband worked for Exobyte. They dated for a time, and then in late 1991, Wife moved into Husband's home, and they lived together there until that house was sold shortly after their marriage. Neither party held down formal "jobs" during much of the marriage. Husband's work was to invest and reinvest his retirement nest egg, and Wife assisted him to some extent (Husband says she helped very little and was just a "housewife," and Wife asserts that she helped quite a bit). In the year 2000, Wife began working as a real estate agent, and during the four years 2000–2003, her gross income was $225,000.00. During the course of the approximately 10–year marriage, the parties' gross income was over $2,000,000.00, and the parties expended about $900,000.00 of that on living expenses.

[¶ 7]   Husband came to the marriage with approximately $1,250,000.00, which he earned working in the high-tech manufacturing field and which he considered *his* retirement nest egg (this amount included his home which was valued at about $450,000.00). Wife, on the other hand, came to the marriage with very few assets. Husband's position in these proceedings is best summed up by the following testimony given by him at trial:

Q. Now, at the time you left high-tech manufacturing and you had this asset base that you described, what were your plans in terms of going forward with those assets?

A. The plan on going forward was to utilize the assets by investing in property, primarily mountain property, doing some improvements and reselling the mountain property to earn a living off the increased value of that mountain property. And to constantly reinvest the basis so that the amount of money never changed.

Q. And why was it important for you to preserve the basis of the assets you started with when you left high-tech manufacturing?

A. It was my total retirement. It was 26 years of a career. It was the idea that I wanted to have a viable retirement, and I

wanted to be relatively well provided for in that retirement through those resources. I had no other retirement program at all.

[¶ 8] Furthermore, Husband emphasized that the parties cohabited for quite a while, but he then reluctantly agreed to marry Wife because she wanted to have a child with him, and he agreed to "accommodate her with that." No children were born of the marriage, however. Husband also contended that the parties entered into an informal premarital understanding with respect to his retirement funds:

Q. Okay, at the time you and Mrs. DeJohn got married, or rather prior to that time, did you have any discussions with her regarding your assets and your plans with regard to those assets that you just described?

A. Absolutely.

Q. What did you tell her regarding the assets that you had in your possession?

A. That I wasn't willing to risk those assets and wasn't willing to start my life over. That at 45 years old and after 26 years of earning those assets independently, I was not going to entertain a relationship whereby those assets would become community property or joint property.

Q. What was her response when you made those comments to her?

A. Completely affirmative. Complete autonomy with regard to the assets. Complete autonomy with regard to the usage of those assets, in that that was my way of earning a living.

Q. Would it be fair to say that she assured you that she would not make any claims against your assets in the event of a divorce?

A. Absolutely assured me of that, no claims at all on the assets, and no attempt to deal with those assets in the course of the marriage, other than to let me do what I was going to do with them and earn a living through them.

[¶ 9] Husband conceded that several of his assets were titled in the parties' joint names at the time of the divorce, but he explained that as follows:

Q. Did there subsequently come a time where you did in fact place certain assets in joint tenancy with Mrs. DeJohn?

A. Beginning after the sale of the— well, there was discussion early in the marriage about the fact that if I died Cindy would inherit nothing, so what I did is I put some assets in joint tenancy, that would be the ones she would inherit if I died. And that was probably around 20 percent[1] of the total assets. It was a few assets and they tended to be long-term more life-style oriented than business oriented assets.

The bottom line was that Husband wanted to keep all assets that could be traced to his retirement funds, without regard for how those assets were titled at the time of the divorce. Specifically, Wife asked that the following jointly held assets be divided equitably in accordance with Wyo. Stat. Ann. § 20–2–114 (LexisNexis 2005):(1) The marital home at 58 Overlook Road; (2) Notes receivable on the Vedauwoo Springs lots that were titled in their joint names; (3) Rockaway Ranch Lots purchased with a line of credit for which Wife was also liable; and (4) $155,000.00 in their joint bank account.

[¶ 10] The district court issued the following decision letter:

The Plaintiff, Cynthia DeJohn and the Defendant, Kenneth DeJohn, were married to each other on July 30, 1993, in Boulder, Colorado. No children have been born as a result of the marriage. The parties have been separated since January of 2003. The Defendant worked in the high-tech industry until 1995. At the time of the marriage, the Defendant had approximately $1.25 million dollars in assets. Since 1995, the Defendant has been involved in the acquisition and resale of real property.

The Plaintiff, at the time of the marriage, had virtually no assets. Since the year 2000, the Plaintiff has been employed

---

1. Husband was apparently unaware that he could not disinherit his wife. *See* Wyo. Stat. Ann. § 2–5–101 (LexisNexis 2005).

as a real estate agent in Laramie, Wyoming, and has made as much as $70,000 in the year 2003.

During their marriage, the parties lived in Boulder, Colorado, and then moved to Kemmerer, Wyoming, in 1997. The parties, thereafter, moved to Cheyenne, Wyoming, in 1998, and ultimately to what is known as the Overlook Road home in the Vedauwoo area between Laramie and Cheyenne.

The Plaintiff currently lives in a home that she is purchasing in Laramie. The Defendant resides at the Overlook Road residence.

During the course of the marriage, the Defendant bought and sold various pieces of property, the profits of which the parties used for their living and enjoyment.

It is clear that during their married life together, the Plaintiff and Defendant enjoyed a prosperous lifestyle.

The parties have mutually agreed and divided a great deal of personal property. The order, entered herein, should reflect that those items of personal and real property that have been mutually divided to the parties in satisfaction, should be set over to them as their sole and separate property.

At issue, however, is in excess of $1,000,000 in assets that include the marital home and adjoining lots, cash, and various mortgage notes.

The Plaintiff contends that these assets should generally be split equally since they were acquired during the marriage. The Defendant, however, believes that he should receive virtually all of the assets since they can be traced back to the 1.25 million dollars that he brought into the marriage.

### Discussion

The Court generally agrees with the Defendant's analysis. The Defendant brought in excess of $1,000,000 into the marriage, while the Plaintiff brought virtually nothing. The Plaintiff and the Defendant have not been married a long time. The Defendant explained to the Plaintiff, at the inception of the marriage, that it was his intention to use his money to invest and make a living. All of the properties and assets that the parties currently have can be traced back to Mr. DeJohn's original assets that he brought into the marriage. The fact that the assets have turned over and that some are in the joint names of the parties, does not change the fact that the origin of the asset was with Mr. DeJohn. This Court believes that there is a general exception to the foregoing.

The Plaintiff made substantial investments of time and effort regarding the development of a mobile [home] park in Kemmerer, Wyoming, that was originally bought by the Defendant. In that regard, Mr. DeJohn initially invested $256,000 to purchase the mobile home park. Additional outlays of capital by Mr. DeJohn resulted in an investment basis of $563,000. The park was ultimately sold for $725,000, thus resulting in $162,000 profit to the DeJohns. The Court believes that Ms. DeJohn is entitled to one-half of that profit, since it was attained in part through the Plaintiff's efforts.

The parties then took the proceeds from the sale of the mobile home park and ultimately used those proceeds to buy their home on Overlook Road. That property was purchased for $285,000. The parties have submitted evidence of differing current values for the Overlook Road residence. The [Defendant's] testimony indicates the market value is $355,000, while the Plaintiff's evaluation of the property is $450,000. The Defendant's evaluation is based upon an appraisal, however, the Court finds that the Plaintiff's evaluation, given her real estate background, also has proper foundation. The average between the two evaluations is approximately $400,000, which the Court finds to be the proper current valuation of the Overlook Road home. This results in a $115,000 appreciation of the home since it was purchased. The Court believes that one-half of that amount should also be set over to the Plaintiff.

Taking the two amounts together, attributable to the appreciation from the mobile home park and the marital home, the

Court believes that the Plaintiff is entitled to $138,500.

The Court would also note, that the Plaintiff has placed a significant ($60,000) down payment on her current home in Laramie. That home is also well furnished. The Plaintiff has an excellent vehicle and other personal belongings. This taken together with $138,500 that the Court is awarding to the Plaintiff, places her in a substantially better position than she was at the time she entered the marriage. The Defendant, however, will be in approximately the same position he was at the time the marriage began.

It is the order of the Court that by January 15, 2005, the Defendant shall pay to the Plaintiff, the sum of $138,500. Failing that, the Court will be required to set over to the Plaintiff various assets worth $138,500. The Plaintiff is also entitled to the four mounted elk heads that she harvested, one of the two freezers, and the remainder of her personal items stored in the basement of the Overlook Road residence. The balance of the property, real and personal, shall be set over to the Defendant including the marital home, adjoining lots, mortgage notes and cash. [Vol. I, 101–3]

The Decree of Divorce accurately reflected the district court's decision letter.

## STANDARD OF REVIEW

[¶ 11] There are few rules more firmly established in our jurisprudence than the proposition that the disposition of marital property is committed to the sound discretion of the district court. Judicial discretion is made up of many things, including conclusions reached from objective criteria, as well as exercising sound judgment with regard to what is right under the circumstances and without doing so arbitrarily or capriciously. We are required to ask ourselves whether the trial court could reasonably conclude as it did and whether or not any facet of its ruling was arbitrary or capricious. In accomplishing our review, we consider only the evidence in favor of the successful party, ignore the evidence of the unsuccessful party, and grant to the successful party every reasonable inference that can be drawn from the record. *Holland v. Holland*, 2001 WY 113, ¶ 8, 35 P.3d 409, ¶ 8 (Wyo.2001). Moreover,

> We apply an abuse of discretion standard when reviewing divisions of marital property and, recognizing that property settlements present complex problems requiring the trial court to assess the respective merits and needs of the parties, we will not disturb the result absent a manifest abuse of that discretion. *France v. France*, 902 P.2d 701, 703 (Wyo.1995); *Neuman v. Neuman*, 842 P.2d 575, 578 (Wyo.1992); *Kennedy v. Kennedy*, 456 P.2d 243, 247 (Wyo.1964 [1969]). We will find an abuse of discretion when the disposition shocks the conscience of the court and appears so unfair and inequitable that reasonable persons could not abide it. *France*, 902 P.2d at 703.

*Mann v. Mann*, 979 P.2d 497, 500 (Wyo. 1999)

*Odegard v. Odegard*, 2003 WY 67, ¶ 10, 69 P.3d 917, 920–21 (Wyo.2003).

[¶ 12] In *Sweat v. Sweat*, 2003 WY 82, ¶ 6, 72 P.3d 276, 278 (Wyo.2003), we articulated a slightly more expansive standard of review under circumstances not dissimilar to those presented by this case:

> The division of marital property is within the trial court's sound discretion, and we will not disturb that division absent an abuse of discretion. *Carlton v. Carlton*, 997 P.2d 1028, 1032 (Wyo.2000). A just and equitable distribution is as likely as not to be unequal. *Id.* We evaluate whether the trial court's property division is, in fact, equitable from the perspective of the overall distribution of marital assets and liabilities rather than from a narrow focus on the effects of any particular disposition. *Id.* From that perspective, we afford the trial court considerable discretion to form a distributive scheme appropriate to the peculiar circumstances of each individual case, and we will not disturb such a scheme absent a showing that the trial court clearly abused its discretion. *Id.* The division of property in a divorce case

should not be disturbed except on clear grounds as the trial court is usually in a better position than the appellate court to judge the parties' respective merits and needs. *Metz v. Metz*, 2003 WY 3, ¶ 6, 61 P.3d 383, ¶ 6 (Wyo.2003). The trial court is also in the best position to assess the witnesses' credibility and weigh their testimony. *Raymond v. Raymond*, 956 P.2d 329, 332 (Wyo.1998). We, therefore, give considerable deference to its findings. *Id.* The ultimate question in determining whether an abuse of discretion occurred is whether the trial court could reasonably conclude as it did. *Metz*, 2003 WY 3, ¶ 6. In answering that question, we consider only the evidence of the successful party, ignore the evidence of the unsuccessful party, and grant the successful party every favorable inference that can be drawn from the record. *Holland v. Holland*, 2001 WY 113, ¶ 8, 35 P.3d 409, ¶ 8 (Wyo.2001).

[¶ 13] Wyo. Stat. Ann. § 20–2–114 (LexisNexis 2005) provides:

In granting a divorce, the court shall make such disposition of the property of the parties as appears just and equitable, having regard for the respective merits of the parties and the condition in which they will be left by the divorce, the party through whom the property was acquired and the burdens imposed upon the property for the benefit of either party and children. The court may decree to either party reasonable alimony out of the estate of the other having regard for the other's ability to pay and may order so much of the other's real estate or the rents and profits thereof as is necessary be assigned and set out to either party for life, or may decree a specific sum be paid by either party.

[¶ 14] With respect to those statutory factors we have said:

"There are no specific guidelines as to how much weight is given to each of the factors;" the "trial court has the discretion to determine what weight should be given each of these individual factors." *Barney v. Barney*, 705 P.2d 342, 346 (Wyo.1985); *Wallop v. Wallop*, 2004 WY 46, ¶ 26, 88 P.3d 1022, 1030 (Wyo.2004). There are

" 'no hard and fast rules' governing property divisions." *Paul v. Paul*, 616 P.2d 707, 712 (Wyo.1980) (*quoting Young v. Young*, 472 P.2d 784, 785 (Wyo.1970)).

*Stoker v. Stoker*, 2005 WY 39, ¶ 22, 109 P.3d 59, 65 (Wyo.2005).

## DISCUSSION

[¶ 15] A primary question that must be answered in a review such as this is whether or not the evidence adduced at trial supports the property division as a whole, not necessarily each individual part of it. *Odegard*, 69 P.3d at 921; *Holland v. Holland*, 2001 WY 113, ¶ 9, 35 P.3d 409, 412 (Wyo.2001). Wife contends that the record does not support the district court's finding that all of the marital property traces back to Husband's retirement nest egg in two very important respects: First, Wife's ownership interest in the property (in particular the marital home on Overlook Road); and her substantial contribution to the single most profitable investment venture during the marriage (the Kemmerer mobile home park). However, Wife's summary of her argument hardly suggests that the trial court abused its discretion or that the district court's distribution should "shock the conscience" of this Court:

Under Wyoming law, absent an abuse of discretion the District Court was empowered to award virtually all the marital property to Husband, even if the Wife owned one-half of it. The Court did not do that. Instead, it found that the property all belonged to the Husband because it "traced back to" his premarital holdings. In doing so, the District Court disregarded the evidence concerning the Wife's ownership and contribution.

Continuing, Wife contends that none of the assets held by the parties at the time of the divorce were *"brought into* the marriage." Therefore, the district court's finding to that effect is an abuse of discretion because it is not supported by the evidence. Furthermore, Wife contends that none of the marital assets can be "traced back to" Husband's premarital property. We cannot agree with that proposition, because the evidence certainly supports the fact that virtually all of

the assets of the parties, at the time of the marriage, were Husband's assets. Moreover, Husband's Exhibit 60 supports the district court's conclusion that the marital assets do "trace back to" Husband's initial economic stake in this marriage.

[¶ 16] Wife focuses on this single sentence, quoted from *France v. France*, 902 P.2d 701, 704 (Wyo.1995), as providing the framework for our standard of review: "The property which is subject to division under our statute consists of property which is the product of the marital union and was acquired during the course of the marriage by the joint efforts of the parties." We include the entire paragraph from which that sentence is borrowed for the sake of clarity and completeness:

> The property which is subject to division under our statute consists of property which is the product of the marital union and was acquired during the course of the marriage by the joint efforts of the parties. The statute requires such property to be disposed of in a just and equitable manner between the parties in the exercise of judicial discretion. We have held a just and equitable division is as likely as not to be unequal. *Blanchard v. Blanchard*, 770 P.2d 227 (Wyo.1989). Wyo. Stat. § 20-2-114 includes as a factor, 'the party through whom the property was acquired * * *.' In *Warren v. Warren*, 361 P.2d 525 (Wyo. 1961), we held property, which was inherited by or given to that party, can properly be awarded to the party by whom it was inherited or given. In *Paul v. Paul*, 616 P.2d 707 (Wyo.1980), we held it is not an abuse of discretion to award to a party the property he brought to the marriage.

*France*, 902 P.2d at 704.

[¶ 17] In many respects, Wife's argument amounts to a semantic quibble over whether "property brought to the marriage" means something totally unrelated to assets that are readily "traced to" property brought to the marriage. The language from the governing statute is "the party through whom the property was acquired." Wyo. Stat. Ann. § 20-2-114. Moreover, we are also mindful that the district court's action should be sustained on any basis apparent

from the record. *Pasenelli v. Pasenelli*, 2002 WY 159, ¶ 16, 57 P.3d 324, 331 (Wyo.2002); *Heyl v. Heyl*, 518 P.2d 28, 30 (Wyo.1974). It is apparent from the record that the gist of the district court's finding is that Husband was the "party through whom the property was acquired."

[¶ 18] Wife contends that Husband made a gift to her by titling property in their joint names. In *Barton v. Barton*, 996 P.2d 1, 4 (Wyo.2000), we said:

> [T]hat when title to real estate was taken in the names of both spouses but only one spouse paid for it, there was a rebuttable presumption that a fifty percent interest was intended as a gift to the nonpaying spouse. *Tyler v. Tyler*, 624 P.2d 784, 785–86 (Wyo.1981). It follows, then, that when a spouse pays for real property and titles it in the other spouse's name, there is a presumption that the entire property is intended as a gift.

In the instant circumstances, reviewing the evidence in the light most favorable to Husband, we cannot say that the district court abused its discretion in concluding that Husband's testimony surmounted that presumption.

[¶ 19] Finally, we will briefly comment on the additional issues that Wife contends were raised by Husband's brief. Whether or not Husband was "employed," as that term is commonly understood, is once again a semantic quibble. During the marriage, Husband was engaged in various forms of investing, including the buying and selling of real estate for profit and holding mortgages for the interest they earned. By means of that occupation, he earned over $2,000,000.00, and to call it "employment" does not constitute an abuse of discretion. The district court did not conclude that there was a formal prenuptial agreement, but only that the parties had an "understanding" of some sort in that regard. That conclusion is well supported by Husband's testimony. The same can be said of the "estate plan." Husband referred to his placement of some assets in joint tenancy as a sort of "estate plan," and the district court's assessment of those facts does not constitute an abuse of discretion.

The district court's decision letter credits Wife with her contribution to the success of the mobile home park and, although Husband may have "falsely attacked" Wife's credibility, we are unable to conclude that that somehow undermines the district court's exercise of its discretion with respect to the entirety of the property division scheme. It is understandable that Husband would want to secure his retirement nest egg, and apparently that rather strong motive prompted him to take a "no holds barred" approach to debasing and demeaning his wife, although there is nothing in this record that would support a conclusion that Wife's character was anything but worthy.

## CONCLUSION

[¶ 20] We have carefully examined the record in this matter and conclude that the district court's distributive scheme was not an abuse of discretion. The Decree of Divorce is affirmed.

KITE, J., specially concurring.

[¶ 21] I concur in the majority opinion, but write separately to express my concern that both the district court and the majority appear to have placed some reliance upon the husband's claim that he told his wife, prior to their marriage, that he considered the cash he brought into the marriage not to be marital property, but, instead, his personal retirement "nest egg." The district court stated, in its decision letter, "[t]he Defendant explained to the Plaintiff, at the inception of the marriage, that it was his intention to use his money to invest and make a living." While

recognizing no formal prenuptial agreement existed, the majority concludes the husband's testimony supported a finding of an " 'understanding' of some sort." Without further factual development, this justice wonders whether any "understanding" existed, or whether husband's recollection of pre-nuptial discussions are colored by the self-interest of a party to a divorce.

[¶ 22] We enter dangerous territory when we base divisions of marital property on one spouse's testimony that the other spouse had orally agreed at the time of the marriage that certain property, and apparently any increase in the value of that property, would be beyond the reach of this state's divorce statutes should the marriage fail. Perhaps in no other arena is it more important to have the alleged agreement in writing. Determining whether an oral pre-nuptial agreement, if found to exist, is enforceable raises further questions including the applicability of the statute of frauds. *DewBerry v. George*, 115 Wash.App. 351, 62 P.3d 525 (2003).

[¶ 23] However, I am convinced the record supports the district court's exercise of its discretion in the equitable division of the marital property and, therefore, concur in affirming the judgment of divorce.